Case 14-3057 James Obergefell et al. v. Lance D. Himes et al. and 14-3464 Brittany Henry v. Lance Himes. Oral argument not to exceed 30 minutes per side. Mr. Murphy for the appellants. May I please record Eric Murphy, State Solicitor of Ohio for the Interim Director of Ohio Department of Health. These two Ohio cases involve state recognition of out-of-state same-sex marriage and in that respect they're distinct from the Michigan case that was just argued which involves in-state licensing or performance of same-sex marriages. But the fundamental question in all of these cases is the same, and that fundamental question is not whether Ohio should recognize same-sex marriage, but who should make that important decision of public policy on behalf of the state. In rejecting the Ohio voters' decision on this public policy issue, the district court ignored its place within the judicial hierarchy and our constitutional democracy. And I'd like to begin with the Baker point because I think it's every bit as significant on this recognition case as it is on the Michigan licensing case. In the prior discussion, the First Circuit case of HHS v. Massachusetts was discussed. And in that case, I think that analysis has it exactly right where Judge Boudin talked about how any right that they recognize has to be consistent with Baker, which is a result that does not lead to same-sex marriage. And the plaintiffs in this case have not proffered really any grounds on which to distinguish the right to recognition from the right to licensing. And because of that, I think that's essentially they make the same approach with respect to Baker as the other cases have done, which is to say that doctrinal developments have superseded Baker. That's not quite true with respect to the non-recognition part of the Ohio case because didn't Judge Black point out that there's this wrinkle that Ohio doesn't seem to equally enforce this prohibition on out-of-state marriages that aren't consistent with Ohio requirements for marriage licenses? In the equal protection context, he did suggest that this refusal to recognize out-of-state same-sex marriages was unprecedented, which I don't think is correct. I think the way the courts have gone about it is to distinguish between what they call void and voidable marriages. And void marriages are just those marriages that violate what would be deemed a common-law marriage. And so they would not be recognized whether they were recognized by another state. Can you say that over again? A common-law marriage out-of-state would be considered void in Ohio? So the way the courts undertake the choice of law analysis is to say if the out-of-state marriage is only voidable, then we'll recognize it here even if it is unlawful here. And that's the Mazzolini case. That's the first cousin marriage case. But for other types of marriages, if the marriage would be deemed void, which the Ohio courts did take to mean not recognize that common-law essentially, then they wouldn't be recognized now. And so we cite the In Re Stiles case, for instance, the uncle-niece case, where that was an in-state Ohio marriage. Granted, it was a common-law marriage. But the court established the rule that that was absolutely void and the court would not recognize it. And that void versus voidable is the distinction, not the same-sex marriage versus opposite-sex marriage. And so I think that's one example for why I think Baker is all about controlling, because they have to make these distinctions. Another distinction they try to make is to say that there's a substantive due process right not to marry, but to marriage recognition. And I don't even think you need to get to the Glucksburg analysis, because under the Supreme Court's cases and this court's cases, when you have a specific provision directly on point, a specific textual source of protection elsewhere within the Constitution, then you don't even get to a substantive due process analysis. And I think that is applicable here. The full faith and credit clause is the clause dealing with when one state has to recognize another state's laws. And the plaintiffs have made no argument, at least with respect to the marriage license itself, that that would violate the full faith and credit clause. Instead, they say there's some type of substantive due process right to marriage recognition. But the analogy we make in the briefs is to this court's Brandenburg case, where it refused to engage in any type of substantive due process analysis with respect to a free speech case, essentially saying substantive due process is not a super First Amendment. And we're essentially making the same point here, that substantive due process is not a super full faith and credit clause. So all this goes back to the notion that all the rationales to try to distinguish Baker fall flat. What's your assessment of the phrase doctrinal developments that Judge Autry asked about? So I think, based on this court's own precedence in song, my interpretation of that phrase is, OK, well, if you have a case that has all but overruled a summary dismissal, but they just didn't know of the summary dismissal so they don't expressly cite it because the Supreme Court maybe just didn't know the summary dismissal because it was a one line order, that is the type of doctrinal development that is necessary in order to implicate that provision. And I think that's consistent with what this court has already held in the song case that's cited in our brief, where the court in song essentially said that these summary dismissals and regular opinions should have the same precedential value. And I think that that means that summary dismissals, every bit as regular opinions, trigger the Agostini and Rodriguez rule. And so I don't think Agostini and Rodriguez can be distinguished in the manner, at least consistent with this court's cases, to suggest that that rule is only for regular decisions and not for summary affirmances. Aren't there some opinions that suggest, if they don't hold, that one of those summary dismissals, like this 11 word long one we're talking about, might have some kind of binding effect on the court from which it came, but not against the world? I don't think that's true. I think that at least the distinction that Wright and Miller draws and the distinction that the Supreme Court's cases have drawn is the binding effect that it has on the lower courts versus the binding effect that it has on the Supreme Court. And the Supreme Court has quite clearly, as we can see, said that it has less binding effect in the Supreme Court. Well, of course, that was a Michigan, or I'm sorry, Minnesota case, came out of the Minnesota Supreme Court, did it not? That's true, Your Honor. Okay. Can I ask this, Mr. Grunn, and whether he has standing? I may just be a little confused here, but you have to address standing because it's jurisdictional if, without that party, you wouldn't have a case. But I also thought that if you have other parties that clearly do have standing, one doesn't have to address it. Do we have to address, Mr. Grunn? I do think you do because I think that the rule that you're talking about only applies when they're seeking the same relief. And I thought his relief is more facially. The relief that the plaintiff sought in Obergefell was just an as-applied, we want our death certificates. But he wanted broader injunctive relief, essentially facial relief, allowing him to put on the death certificates of any future clients. And so I think the court in the NRA case that is cited in our brief, I think footnote 4, actually, it says, yes, that's the general rule, but when they're not seeking identical claims, then you have to. So you're saying here one claim not involving Mr. Grunn is just as applied as to one death certificate, but without Mr. Grunn, you can't attack more broadly the non-injunctive case? Yeah, the injunction would essentially be more forward-looking versus. I got it. I got it. I lost the other side of that question as well. Okay. Okay. And with respect to, I'm happy to talk about the third-party standing point now as well. With respect to that, I think it's pretty straightforward. I think the easiest route there is the third-party standing doctrine that there has to be a close relationship. And Kowalski, the U.S. Supreme Court's decision in Kowalski, made clear that a lawyer's future prospective relationships with clients was insufficient to establish the necessary closeness. And I think that is on all fours, I think, with this case. I think I would hope that a lawyer's relationship with a client is. . . The future clients. Future clients. Yes, Your Honor. That's correct. This Mr. Grunn has current clients, and he is a member of the class, and his business actually is primarily dealing with the class that's at issue as to burial, funerals and burial. I would think that you could make the same distinction. I believe he is talking about future clients. He hasn't identified any other specific clients other than, I believe, Obergefell. So it is the future client world. The response to Kowalski is to cite Craig v. Boren, which was the case dealing with beer vendors. But Kowalski itself distinguished Craig as being about where the transaction between the two parties is itself illegal. In that case, the vendors could not sell beer to minors. If there was no impediment to reaching these issues, essentially the same issue in the Tennessee and Kentucky cases, then it starts to look insignificant. Do you hear what I'm saying? In other words, either by upholding or invalidating, then what do we care about, Mr. Grunn, in Ohio? I mean, you'd have a rule of decision that would be binding in the Sixth Circuit, and barring a meaningful distinction between the different state non-recognition laws wouldn't make a difference, would it? So there's a difference between as a matter of precedent and as a matter of just facial relief, and I would completely concede that the state would either – it would depend on what the opinion would say, but it would either have to attempt to distinguish the opinion or be bound by it. But I still – I don't know that that – I think that standing still has to be within – with respect to these cases. So that's – I think that's the easiest way out with respect to third-party standing. And then the other factor for third-party standing, not only closeness, is hindrance. And, I mean, these suits are all over the country right now, so there's not too much of a hindrance to the gay and lesbian community asserting their own rights. Say you get beyond Baker, you get the sense from reading some of these other district court decisions and court of appeals decisions that they're measuring a trajectory. And it does seem fair to say that the Supreme Court opinion trajectory favors the plaintiffs, even if it's also equally fair to say that those cases don't compel an answer here, don't necessarily answer the question here. But the trajectory does favor them. It just does. From Romer to Lawrence to Windsor, it's true they've not said anything about Baker. It's true they didn't reach today's issue in Hollingsworth. But what's a lower court to do with that? I mean, we're beyond Baker. Setting aside Baker, I think that those – I think those Romer and Windsor, at least, are just garden-variety applications of the animus case. And I think Judge Holmes' concurrence in the Bishop case was a pretty good analysis as to why this type of animus doctrine can't apply here. And that's simply because in Windsor it was an unusual federal intrusion into what had always been a state matter, and in Romer it was an unusual expansive elimination of one class of people's rights. And that just cannot explain the traditional definition of marriage, which has existed since the founding of the state and can't really explain either, I don't think, the 2004 amendments, because I think the 2004 amendments were explained primarily by democracy and the citizens and the General Assembly worrying that this fundamental question of public policy would be taken from them either by the Massachusetts court or by the Ohio Supreme Court. And it's a rational response to that concern to pass a constitutional amendment retaining the traditional definition of marriage. So I think Judge Holmes had it exactly right in Bishop by suggesting that in both of those cases what they're really looking at is the facially unprecedented laws. And when there's facially unprecedented laws, they raise the judicial eyebrows, so to speak, to apply this type of animus doctrine. And I just don't think that that concern is present with respect to the laws that have existed. There's nothing unusual about following the usual course, I would say. So I think those cases are distinguishable on that ground. Then with respect to rational basis, we talked about democracy. I think a distinct rational basis in the recognition cases is also just uniformity and having just one position on this fundamental issue such that the laws cannot be easily evaded. And so that uniformity rationale also explains the... What implementation problems arise if the plaintiffs win? I certainly think that it would require a... I don't know if it's an implementation problem, but I think that it would certainly require a legislative response. For instance, birth certificates have father and mother. I mean, maybe it should be changed to just parent one and parent two. I mean, this is just a pragmatic response, but I would imagine those things... It's a pragmatic question. I would imagine those things would happen throughout the Ohio Revised Code where there's references to husbands and wives. And so I certainly do think that the General Assembly would have to do a pretty thorough read of the Ohio Revised Code to determine what needs to be updated in light of whatever constitutional developments arise. But other statutes about divorce, adultery, all that, all I'm hearing you say is that, well, yeah, you just have to use spouse or... Spouse or parent. That's all that would have to change. That's true. There's nothing else. So I don't... I mean, and then, like, the tax code as well for... Right. So, yeah, I mean, the pragmatic question, you know, frankly, Your Honor, I didn't anticipate the question, so I didn't review the revised code all that closely myself. Did you bring it with you? Maybe I should have. But, yeah, yeah, I do think that there's no doubt that it would require new laws being passed. Or forms being reprinted, perhaps. Yeah. So you're on rational basis. So what are the... So in addition to the ones already mentioned by Michigan, I think the two concrete ones with respect to out-of-state recognition, democracy is number one, and concerns about Massachusetts controlling Ohioans on this issue, uniformity. I just think proceeding with caution, it strikes me as a rational response to a new concept. So if we accept that, which is kind of a variation on the pacing point, maybe that's a rational basis. I'm not sure. But let's accept for the sake of argument that it is. It surely can't last forever. So how does a court implement that? I mean, you say now they get the benefit of the doubt and use it in 10 years. How does that work? So the cautious approach, I think the court implements it in the Eighth Amendment, for instance, where the evolving standards, they look to how society has changed over the years, and they count up the states. I mean, I think you look to all the factors. So the way to handle the pacing point and show that it doesn't go forever is you hit some trigger, some number of states that recognize same-sex marriage, and at that point it's appropriate not to have the state continue to wait. I certainly think that's one response. I think the basic point is that it's just too new today. So maybe, I mean, the law is always about drawing lines, and at one point maybe it becomes an irrational idea to proceed with caution, but I don't think we're there yet. I don't know how many states there are in the Tenth Circuit, but they came in with Utah and they've added Oklahoma. I don't know how many more states there are in there, but if there are three or four, you've now got, what, 25 states by your reckoning, which is a majority, and we throw in four more, and then you've got almost 30. I'm just, I mean, hypothetically. It is hypothetical. I do think that just the concept itself is too new, so I do think that there are looking at— Well, the Fourth Circuit just came down with an opinion that affected Virginia. Wouldn't your guess be that that's now going to apply to North Carolina, South Carolina, and who else is in there, West Virginia? That's true, but I think there's a difference between saying whether it's a rational— I don't think you can pick the states where the courts have gotten involved rather than through democratic— Well, you just told me I should count the states, though, and I'm telling you I'm counting. I think that the way to count the states, I think, is through the states that have, through the democratic processes, have adopted that type of change, and I think that if you take that number, I think it's— Well, we've now got 20-something states that see no reason to fuss about this in the legislature because the courts have already decided to question. Now, that, of course, assumes that the Supreme Court is not going to knock it sideways, but, you know, they can count, too, and it is my feeling that they probably do look at the polls. Maybe the counting point that's somewhere between the two of you is you don't necessarily count all the states within a circuit that's ruled one way, particularly if there's going to be an appeal, because that doesn't tell you the bottom line, but you do count the states covered by those circuits where the state attorney general or state governor has decided not to appeal because in those states, it's over, as best I can tell. So maybe that's the relevant number, and that's the number around 2021, I think. I still think it's still too—I mean, the fact of the matter is the majority of the states have retained the traditional definition of marriage, and I think that the cautious approach makes sense. I think Justice Alito's dissent goes through this quite well. In footnote 5, he talks about how changes to the way marriages— changes to changes in marriage have taken decades to determine whether they—the effects of the change, and I think it's just too early to tell us when the first state to recognize marriage was in 2004. So what do you think if he'd been writing the opinion in Windsor it would have looked like if Alito had been in the majority and written the opinion? What do I think it would have looked like? What would he have said? I think that—well, he makes the distinction that he doesn't think that the federal government's decision with respect to Section 3 was based on animus, so I think he would have distinguished Romer on that ground, but I do think that this is a different question. I think the main focus on Windsor was the unusual nature of the federal intrusion into marriage, and that's simply not the case with respect to the state of Ohio retaining its traditional definition of marriage. When we think about the methods by which states—if we are interested in the federalism idea, when we think about the methods by which states adapt to changing mores, we're not, I don't think, speaking so much about the more local aspects, that people elect folks to the General Assembly in Ohio, for example, or whatever legislative body whom they have asked what their views are and use the democratic process to try to move things along locally and then statewide. I don't think we're talking about that so much, or the impediments to getting change, the pacing, speed it up. Yeah, I just think that it's a cautious approach to a fundamental change in marriage when it's only been 10 years. It strikes me as completely rational, and I think any voter in Ohio might have had that very rationale in 2004 when they voted for this law. What would you say if a form of heightened scrutiny applied? I mean, you have to concede it's a much harder case. Would you concede you lose, or what's your take on the case of heightened review? I think Michigan's response was interesting with respect to the gender discrimination. I think another response is uncertainty. Uncertain facts does not inevitably mean that the state, if it is heightened scrutiny, loses. I would point to Gonzales v. Carhartt. There was uncertain facts there under what seemingly is a higher standard, the underburden standard, and the court said we have these facts. We don't know whether a health exception is necessary or not, and we're going to defer to the legislative branches on that fact. I think the same analysis could be undertaken here. But I also point to, I think, the town of Greece case that was just decided the last term where the court expressly indicated that the test that you adopt also has to be consistent with the history and practices of the people. And so I think that if you think that heightened scrutiny versus rational basis review actually makes the difference, I think the town of Greece is a good indication that rational basis review is the appropriate test precisely because the traditional definition of marriage has been with this country since its founding. So with the last minute, I'll just briefly talk about the full faith and credit clause claim, which is the last claim in the Henry case. And I think the basic analogy there is that full faith and credit clause claims are not cognizable under Section 1983 because the full faith and credit clause is just like the supremacy clause. It's a choice of law rule that says when a state has a claim that you should look to the state of judgment preclusion law rather than the law of the state where the suit is filed. So it's essentially a choice of law rule in the same way that the supremacy clause is a choice of law rule. And if there's no questions on that. There is a question, Mr. Murphy. Do you have any knowledge of how many years it was from the start of the campaign until the 19th Amendment when women achieved the right to vote? Are you familiar? I'm not, Your Honor. If I told you that it took 78 years of crossing the desert back and forth, back and forth, trying to achieve it through the democratic process, would you be surprised? Well, not with respect to the United States Constitution because the United States Constitution sets a very high bar for constitutional amendment. No, no, no. I'm talking about the going into every state in the country, every city, every school board election for 78 years and trying to get enough going to convince the legislatures to adopt or to extend the vote to women. 78 years of it. And would you be surprised to find out it didn't work? And it took an amendment to the Constitution to finally achieve that after 78 years? Yes. There's no question that the U.S. Constitution is very difficult. No, no, no, no. That's not the question. Excuse me. You're not getting the point. The point is you want to do this democratically, state by state, legislature by legislature, municipal government by municipal government, as far as I know, and it just doesn't always work. It doesn't always work. 78 years to get women just the right to go to the polls and vote. That's all. You don't have to respond. It's okay. I just thought you'd like to know that in case you're ever on Jeopardy. You can respond now or you have five minutes rebuttal to think about that and train for Jeopardy. Okay, Mr. Gerhardstein. Thank you. I want to go this way. May it please the court. Al Gerhardstein for the Appellees in Obergefell and Henry. Three babies have been born to the Henry plaintiffs in the last two months. One adoption has been finalized a few months earlier for another plaintiff couple in Henry. All four same-sex couples all were married in one of those 20 to 21 states where the issue is done. Marriage for same-sex couples is available. So Ohio refuses to recognize these marriages and in so doing also refuses to these couples and to their children recognition of parentage. So instead, Ohio issues a birth certificate that names only one member of each couple as the parent and denies recognition as a parent to the other. That's a real serious harm. Ohio also says to the surviving spouses in Obergefell, you must accept a death certificate for your loved one that's wrong, one that does not say you were married even though you are, and one that leaves blank the spot where your name should go as a surviving spouse. So Ohio, and this is such a big difference between the Ohio and Michigan cases, I totally support and agree with the arguments in terms of the fundamental right to marry, but at this point we're just doing a recognition case. And the Ohio marriage recognition ban. May I ask you a framing question? Sure. I'm fearful is a little simplistic, but I'd love to hear your reaction to it. Because we do have all these cases and we have all these issues, my rather simplistic way of looking at it is, isn't the first question whether a state can decide for its own purposes, its own citizens, whether to recognize same-sex marriage? And if it decides it's not going to do that for now, and if the U.S. Constitution, here's the key if, if the U.S. Constitution permits that choice, I guess it seems really odd to me that they can be told, okay, even though you can make that choice for your own citizen, if someone comes from another state, that public policy choice doesn't bind you. So I guess I just think of the case and vice versa, if you win that issue, if the state of Ohio under the 14th Amendment must recognize same-sex marriages within its state, then of course it follows you win the recognition point. Okay, let's look at our decision grid, all right? Because you're suggesting that the question of states defining marriages is a threshold question for all of this. It's one way to think about it, and maybe it's too simplistic. Well, it's one way to do it. But when we look at the question of marriage recognition, you've got your question over here. What is the state's definition of how, what kind of access will they provide to marriage? And that can be a fundamental right to marriage under Turner, under Loving, saying that it's a bilateral association, it's a fundamental right, therefore same-sex couples get to marry. A number of states have already done it, and other courts have already ruled that way. If that's the situation, our case is simple, it's a corollary of the fundamental right to marry. Then you have also under due process the notion that once you're married, that attaches all kinds of vested rights. You have important parenting rights, you have important child-rearing rights that have been recognized by the Supreme Court. And for history, that's been transportable across state lines. So that's a separate argument under the due process clause that there is a fundamental right to marriage recognition, that it's transportable. And then you have another line, which is Windsor, which is equal protection. And that says if you've got a really unusual situation like Section 3 of DOMA, where for history the federal governments always accepted the states that say this is a marriage, and the federal government says, okay, we'll accept it as a marriage. Then suddenly, because same-sex couples are getting married, the federal government says, nope, we're now going to get into the business of defining marriage. That's an unusual discrimination. It requires a special consideration. And when the court applied that test, not putting a doctrinal label on it, but certainly working within equal protection, it said that that type of discrimination is a violation of equal protection, that it is the principal purpose to impose inequality. So it wasn't about whether a certain state must or must not define marriage. It was about if you've got a pattern in practice over time that you're only changing because of the type of people that now participate in marriage. Or the government that's doing it. Well, Justice Kennedy in his decision clearly said that he was not doing this on a federalism basis, that he was and the majority ruling should be looked at as an equal protection clause. This case directly fits Windsor. It was the first case filed after Windsor. We looked at the record in Windsor. We went out and hired all the same experts. You have the same record as you had in Windsor, and you have the same problem. Because Ohio did have a long tradition, and it still does, of being on the extreme side of the state of celebration rule. So if you have always accepted first cousin marriages, underage marriages, and common law marriages that you can't do in Ohio, and now suddenly because of the people in these 20 states that are getting married, you say, oh, no, no, we're going to change the rules. That raises the bar. Is it Mazzolini, the Ohio Supreme Court decision? That is one of the cases. That's the first cousin decision. Doesn't the language of the decision indicate that, well, yes, no, the state doesn't have to recognize every marriage in every other state? It's pretty clear. If you go to our brief and you look at all the sources that we cite, including sources that go way back, we can't find another case where Ohio is refusing to recognize marriages from other states that otherwise couldn't be practiced in Ohio. So we really have three ñ there's only three cases. Well, there's not a lot of case law, but they couldn't find any either. The only case they cited was an in-state case. So we have a rule of law, and it is one that Ohio has followed. Then you have the added dimensions because when you look at Windsor and you say, well, what was that special consideration that they entered into and how does that apply to Ohio? You can look to some other rational basis cases because what we're really learning is that rational basis doesn't have just one flavor. I mean, if you've got a group that's targeted because of a history of discrimination, as in Frontiero, if you've got important personal interests at stake, as in Palmore or in Griswold where you've got personal autonomy issues being triggered, if you've got a departure from an established past practice like Romer, then those are all factors that, if we look at the case law, seem to suggest that we're going to look at things a little more closely. How do they apply here? So you can't say this is unprecedented, right, because this is the definition that has existed since the state's been around. No, I'm not talking about the definition. I'm on my third prong. It is unprecedented that Ohio would unilaterally say to a whole group of people who are married in another state, we're not going to accept you as people that we will recognize as married here. I wouldn't say it's unprecedented if the Ohio Supreme Court itself, and it's the key decision you're relying on, says no, this doesn't mean you have to recognize every marriage, even if it's against the state's public policy. Because Ohio, because it was theoretical. They were leaving a back door, but when we look at the real situation here, this back door involves people who have a history of discrimination, people in an issue that's very personal and carries with it very important rights, and it is a departure from... I agree there's a history of discrimination. I don't think there's any doubt about that. I guess what is not so obvious to me is a history of discrimination when it comes to access to marriage. That seems to me a much more recent phenomenon and just a reflection of the current times and a new sensitivity on both sides of the debate. Well, what we really find is that if you look at how the Windsor majority analyzed this, they looked at the history of DOMA's enactment and its own text in order to determine whether this departure is significant enough to trigger a violation of the Equal Protection Clause. And they said it was, that there was equal dignity being denied to same-sex marriages and that it was the essence of the statute, and that it humiliated tens of thousands of children. It said in the federal context that there was no legitimate purpose served in such a statute. That all applies here. There's no legitimate purpose for Ohio to say... In one setting, the federal government is doing something it's never done before and, worst of all, doing it after a state has already decided to recognize same-sex marriage. In today's cases, it's a situation where each state has always been in charge of this issue. That just seems like a pretty serious difference. Well, they've been in charge of the issue of definition, but when it comes to place of celebration rule, this is a rule that they have followed. And as I say, it was a theoretical discussion as to what they wouldn't follow. The deal that these couples made when they got married in New York, California, Massachusetts, Maryland, and Delaware was that they would have a marriage that they could carry from Pennsylvania, which now... Should we add into the logic of this that they were well aware that they were moving to a state where same-sex marriage was not recognized? Your Honor, we are in a situation where the democratic process has evolved. But I think that it goes to the thinking that you propose. Right, but there's not a contributory negligence defense to a constitutional right. I mean, either your marriage is transportable or it's not. They got married because they were in love. They didn't get married trying to think of, well, where can I go here and where can I go there? They do expect that their marriage will be transportable. That's a reasonable expectation. In fact, 44% of the people in this country now live in a state where same-sex marriage is available, where the freedom to marry has been recognized. And that includes those 20 to 21 states where the deal is done, where there's no more appeals pending and so on. That goes both ways, wouldn't you agree? No, because we're now at the point where, and this is why the recognition case is so significant, because at some point when the democratic process has played out, and you are at this scale that we have here, nearly half the country is in a situation where they're being told you can't carry your marriage across a state line. That's the point where, if ever there was one, the constitution requirement of equal protection. The reason I think it cuts both ways is, on the one hand, it helps you in the sense you get, maybe you're getting to some tipping point where it's just outlier states and the courts step in. On the other hand, it suggests the democratic process is working and indeed working effectively and very quickly from your client's perspective. So that's what I mean when I say it. It's been 27 years since Bowers, so it's been a long process of development. But, you know, Judge, what I'm suggesting is that the ultimate role of the federal court is to keep states from denying the liberty to certain citizens. And here, when you've got citizens who have a liberty interest, their marriage already exists, their marriage is done, and they've now got children, and those children deserve to have two parents, and the state is now saying, because of our commitment to democracy, we're just going to say no to you, and we're just going to wait for you to come up with $7 million and reverse our constitutional amendment. And, you know, we'll see you in a few years when you can pull off that kind of fundraising and that kind of democratic action. The reality is that these rights are very, very profound. And we know from Supreme Court case law that a marriage is a very significant thing. It's solemn, it's precious, it's got all these attributes that allow you to have the relationship with your children or with your spouse. And this can't be just subject to vote. I understand that in its early stages, when a state is trying to figure out whether recognition... Maybe it shouldn't just be subject to vote, but I'm just curious why you're so sure about the better path. In other words, let's say the gay community gets to pick the path. You can get your Supreme Court decision in June of next year, or you can have five years to change hearts and minds through democracy in the remaining 29 states. It's just not obvious to me what's the best path. Well, I'm trying to suggest a constitutional path, both under due process and the vested rights that come with the marriage and equal protection. I get it. The assumption of the question was that you can have either one. That's the assumption of the question. It's just not obvious to me why the Supreme Court ruling by five justices in June of 2015 is the better path for the community. Not necessarily clients, the community at large. Changing hearts and minds happens through democracy much more effectively than it happens through court decisions. I understand, Judge, but I represent four couples. Their kids deserve two parents. They deserve them today. And they are entitled to those based on these notions of due process and equal protection, especially when you look at the movement that's occurred. This is similar to the Loving situation, which, by the way, was a recognition case. I mean, that couple moved to D.C., got married, then came back to Virginia and were prosecuted because Virginia wouldn't recognize the D.C. marriage. At the time of the decision in 1967, there were 15 states that had repealed the ban on interracial marriage. There was momentum going in their favor. But the Supreme Court still struck down their prosecution. There were still 16 states that prohibited interracial marriage. That doesn't seem very helpful to your nonrecognition point because that's not the analysis that the Supreme Court follows in Loving. The analysis the Supreme Court follows in Loving is not the fact that Virginia wouldn't recognize a D.C. marriage. It was the fact that Virginia wouldn't recognize, for in-state or out-of-state couples, interracial marriages. So that actual path goes back to the first question I asked, which is we really should start this inquiry from the perspective of whether the state in the first instance has authority to deny same-sex couples a marriage license. You know, even in Windsor, and by the way, those facts came from footnote 5 in Loving, so they did consider it relevant. But even in Windsor, the Supreme Court makes a point to say that it assumes state recognition of marriage is consistent within the state. They say that twice in the majority opinion.  Opposite-sex couples that come in with various legal hiccups in their marriages from other states that Ohio says, oh, never mind. And then same-sex couples that Ohio says, no, you can't have your marriage recognized. And this does get us to the other aspect of equal protection and why special consideration should trigger an equal protection finding and a violation in this case. And that is the notion of animus. We've got in this record a remarkable collection of all the facts that went into the passage of the 2004 Ohio Constitutional Amendment. One of them, just to name one, in the Becker Declaration, it's Exhibit Q, is the state description of the measure. And this is published by Secretary of State Blackwell. It's still on the website. And they have the pros and they have the cons. And under the pros it says this measure will prevent the state from spending any money and allowing homosexuals, which they describe as being in deviant relationships. So there's a real prejudice there. And this notion that the measure gave effect to the private prejudice against gays is one that bears some weight. And I'd recommend to you that the amicus brief from Professor Polvote, of all the amicus briefs, there is one. I have a lot of sympathy for Judge Holmes, I think it is, on this point. I mean, the whole idea is to eliminate otherness. It's not to create new others, a new category of people we're now going to label bigots. No, that's the point. It's not labeling people bigots. It's just like in an employment case where if I represent somebody and my client was fired because they wouldn't exceed to a customer's demand, then I don't have, you know, in a Title VII case, you don't have to, it isn't a defense to honor customer prejudices. In this type of situation, under Palmore, you had a Supreme Court case where a custody decision was made. And the child was removed from a situation because the judge thought, oh, living in an interracial family, that creates too much tension. The judge didn't have any prejudice, but the judge was exceeding to the prejudice of others. And what the Supreme Court said was, don't let us pass laws that actually implement private prejudice of others. So it isn't a finding that somebody's a bigot. It's a finding that a law could get passed. How is it a compliment to the people who passed this that they had animus? This isn't about being a compliment or not. It's about all the factors we ought to look at in order to determine whether this measure targeting this narrow group of people, the same people targeted in Windsor, is constitutional. History of discrimination, this history of targeting, even in the measure's description by the Secretary of State, the text itself, by the way. Think about the text. The constitutional amendment in Ohio says not only that we aren't going to define marriage to include other than a man and a woman, it says no civil union, nothing that approximates marriage. It's saying get away from us as far as you can. And those are the types of things that the Supreme Court looks at when it's even if we're doing rational basis. I won't use labels. I'm just saying these are the factors. They all line up here to say this deserves the same special consideration that the court gave the federal measure in Windsor. And when you do that, especially in light of the role of the federal courts to prevent states from denying liberty to people, to be the backstop, it's appropriate to act now. Was it appropriate before? I don't know. We weren't in this case before. I'll say that now with half the country practically in a situation where they're going to want to bring their marriages across state lines and with those children in the balance, yes, now is the time to act. And it's appropriate to act. I would say also that we ought to think about the harm that we're dealing with in a situation like this. The couples that are our plaintiffs in this case, three of them were impregnated by artificial insemination, so there's no need to go to state court and deal with fathers that are claiming rights. And under Ohio law, if you're married and you use the process of artificial insemination, the father is deemed the parent of the child. So that same rule should apply here. And by the way, the implementation question is easily answered. Just do a definition for all your laws. Get away from husband and wife, get away from father and mother, and go gender neutral. So I don't think that that's a serious impediment to implementing marriage recognition as it would be here. And the difference is huge in this case. You've got the non-birth mothers of these three babies saying, I am a parent. Sue me if my kid doesn't get my support. Call me if my kid doesn't show up for school. Prosecute me if there's neglect of my kid. And Ohio is saying, no, we don't want that. We'll let this kid only have one parent, but if you're an opposite-sex kid, then you will have two parents. That's a super harm to these children. And that's part of why the matter is urgent, because as we get more and more couples with children, as we have in this case, presenting themselves in Ohio, we can't wait on the democratic process and suffer the harm at this level that they are suffering. Both of those names need to be on the birth certificate. And that's very practical. Windsor talked 11 separate times about the dignity that was owed to same-sex couples. And in that opinion, it said repeatedly over and over, targeting these couples for this sort of second-tier status, humiliating these children who are in these relationships, causes the very purpose and the actual core of the statute is to treat them unequally. And that's exactly what's happened in Ohio. So we have both the same lack of dignity that was recognized in Windsor, and we have these very practical problems of children getting only half the parents. And they should get both parents. The district court was correct when it said that the birth certificate is the basic currency by which parents can freely exercise those protected parental rights on the parent's side and responsibilities. It is also the only common governmentally conferred, uniformly recognized, readily accepted record that establishes identity, parentage, and citizenship. And it's required in an array of legal contexts. So in this case, what you see in Ohio is harms that come from marriage recognition, from cradle, as in the Henry plaintiffs, to grave, as in the Obergefell plaintiffs, and everything in between. I mean, without recognition, these couples are denied intestate succession, they're denied lack of consortium in wrongful death cases, they're denied tax benefits, other benefits, and these are benefits that are taken for granted by different sex couples. I mean, I've been married to the same woman for 42 years, three great kids, the law is rigged in my favor because I get tax benefits, I get other benefits, and it's fair, in a sense, to rig it in favor of marriage because we pay our taxes, we buy our houses, we buy stuff at the mall, we take care of our kids, we put less demands on the government, and same-sex couples deserve a piece of that. There's absolutely no reason to treat them unfairly with respect to this balance that the government has drawn with respect to favoring marriage, and it's important. And the death certificate is the same thing. It's important that it be accurate. It's the last record of a person's life on Earth in this country, and to be wrong? I mean, talk about a dignity violation. I mean, that is absolutely huge, and I think it's sobering, really. So each of the four children in the Henry case have two parents, not one. And affirming the district court will cause Ohio to recognize these families and the marriages that anchor them. Affirming the district court will also cause the death certificates of William Ives and John Arthur to reflect their marriages and allow those men to rest in peace. Thank you. Thank you, Mr. Gerritsdien. Mr. Murphy, I think you have a few minutes here for rebuttal. Thank you, Your Honor. Just a few quick points. First, with respect to the question about isn't this case entirely dependent on the outcome of the other case, I think that's frankly exactly correct. How Michigan comes out most likely explains how this case will come out. And if Michigan comes out upholding the traditional definition of marriage, I haven't heard any basis for having an exception for out-of-state recognition. The first point that was made was some substantive due process right that was deeply rooted of recognizing these out-of-state marriages. But, of course, that doesn't take on the notion that you don't create substantive due process rights when there's a textual source of commitment in the full faith and credit clause, and it ignores the equally longstanding public policy. But couldn't we say, if we wanted to, that Ohio is perfectly free to refuse to recognize, to refuse to issue, to refuse to recognize people who get into common-law marriages within the state, but then apparently allow somebody whose marriage is, a common-law marriage is considered valid in another state to come in and recognize that marriage? It's a notion of what Ohio's public policy is. I think there's no question that Ohio would recognize some marriages that would not be lawful in Ohio, but I think Ohio has always retained the exception for those marriages that violate public policy, and this public policy exception long predates this debate. So I don't think there's any way you can say that the exception is tied towards animus or that there's no deeply rooted notion to the exception since it's cited in Mazzolini and it's cited in cases cited by Mazzolini. In Henry Stiles, we cite State v. Brown, which talks about the exception, and that's from the 1890s. With respect to Windsor, I completely disagree that the federalism rationale played no part in the ruling. Of course, it wasn't a structural constitution case, it wasn't a federalism case on the outcome, but the federalism rationale was the entire rationale for why there was animus there, and that federalism rationale is entirely gone here. The federal government had engaged in an unusual intrusion, and it was that unusual law that triggered the animus scrutiny under the Equal Protection Clause, and you just can't say that for these types of laws for the reasons I just suggested, that this public policy exception has been around in Ohio for a long time, and it certainly predates the present controversy, so the public policy exception can't be explained by... The public policy of not recognizing same-sex marriages. Yeah. The content of which would possibly have been illegal and a crime in Ohio for most of that time that you're talking about. Well, that just goes to show that there's no deeply rooted right with respect to out-of-state recognition of same-sex marriage. And then the third point I'd like to just point out briefly is the citation to some of the record materials. In Equality Foundation, this court made quite clear that legislative motivations, especially in the referenda context, are just impossible to determine precisely because it's a referenda, and so it depends on the intent of all the 3 million voters who actually voted for this constitutional amendment, and that's an analysis that's completely... That is literally impossible. You can't gauge into the minds of everybody who voted yes for Proposition 1, and I think that is distinguishable from Romer and Windsor, precisely because the court in those cases didn't engage in the legislative intent in the metaphysical sense. It looked at the laws on their face and said the laws on their face are unusual, and that's just not the case here. So if there's no further questions, I'll respectfully ask the court to reverse the district court in these two cases. Mr. Murphy, can we go back to the 19th century history that we were talking about before you sat down? It occurred to me after you sat down that you thought I was talking about the suffragists crisscrossing the country trying to get an amendment to the United States Constitution. That's not at all what they did. They knew that was virtually impossible. They were going to the local people trying to get the right to vote on the school boards. They were going to each state legislature saying please enfranchise women so that we can vote on the state ballots in this state, and they did it state by state by state. And when it came to the end, and they did get the right to vote finally in a few of those states, there was still the question of whether they could vote in national elections, and that's why the constitutional amendment was required. So I just wanted us not to be talking past each other, if you understand what I'm trying to say. Yes, Your Honor. Democracy might be slow, but in the end, I think it has more legitimacy. And I don't actually think it's going all that slow in this case. I know that there's an initiative process being undertaken now, for instance, to repeal the Ohio constitutional amendment. But with that, if there's no other questions, I'll... I think you may have had a question. No, I'm fine. Thank you, Mr. Murphy.  I appreciate your helpful briefs and argument. The case will be submitted. Court may call the next case.